Filed 9/2/15  P. v. Gebreselassie CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ASMEROM GEBRESELASSIE,<br><br>     Defendant and Appellant. | A133350<br><br>(Alameda County<br>Super. Ct. No. C158985A) |
| THE PEOPLE,<br>     Plaintiff and Respondent,<br>v.<br>TEWODROS GEBRESELASSIE,<br>     Defendant and Appellant. | A134246<br><br>(Alameda County<br>Super. Ct. No. C158985B) |

Asmerom and Tewodros Gebreselassie were convicted of the Thanksgiving, 2006 murders of Regbe Bahrenegasi and Winta and Yonas Mehari.  It is undisputed that Asmerom[1] was the shooter, while his younger brother Tewodros was prosecuted as an accomplice.  Asmerom contends the court committed constitutional error when it deprived him of his right to the retained counsel of his choice, denied requests for continuances after he was granted leave to represent himself, terminated his right of self-representation during trial, and denied his post-verdict request for a copy of the trial

---

[1] Because a number of the individuals involved in the case share surnames, we will in most cases use first names.  We do so only for clarity, and mean no disrespect by adopting this practice.

transcript.  In addition, he alleges prosecutorial misconduct and a number of prejudicial evidentiary errors.

Tewodros contends the trial court erroneously refused to sever his case or grant a mistrial due to Asmerom's misconduct before the court, admitted an investigating officer's testimony that he disbelieved a statement Tewodros gave shortly after the murders, admitted prejudicial double hearsay that suggested he lied about registering a gun he purchased not long before the murders, and refused his request to respond to that testimony.  Tewodros also asserts reversal is warranted for prosecutorial misconduct.  Both defendants maintain that the alleged errors, independently or cumulatively, deprived them of a fair trial.

We affirm the judgment as to Asmerom.  We conclude that the combined effect of evidentiary errors affecting Tewodros deprived him of a fair trial and thus compels reversal of his conviction.

## BACKGROUND

This was a very long trial, spanning some four months before the jury.  The following is an admittedly non-comprehensive overview of the evidence introduced during those months, prefaced for clarity with a brief description of the identities and interrelationships of the two families most deeply involved in and affected by the murders:  the Gebreselassies and the Meharis.  We will supplement the following overview as we address the specific legal challenges raised in this appeal.

### I. The Meharis and the Gebreselassies

Asmerom and Tewodros are two of 11 siblings.  The family includes brothers Abraham, Tewodros, Tesfamariam (Tesfu) Tewolde,  Dawit, Hermon and Mulugeta, and sisters Senait, Asmeret, and Betelhem.  Asmerom, the second oldest, left Ethiopia as a young man in the early 1980's and settled with relatives in Oakland in 1985.  He later helped older brother Abraham emigrate to the United States, followed eventually by their mother and the rest of the siblings.

Abraham met his wife, Winta Mehari, during a vacation in Ethiopia in 1998.  Their son, Issac, was born in 2004.  During the intervening years the Gebreselassie

family helped Winta's mother Regbe and her brothers, twins Merhawi and Angesom, Yonas, and Yehferom, emigrate to the United States. With the exception of Winta, Abraham and Issac, who lived in Berkeley, the Gebreselassies and the Meharis lived in the Keller Plaza apartment complex in North Oakland.

The two families were very close, "like one family," and shared a "very good relationship." Angesom Mehari described the Gebreselassie matriarch as "almost like a mother," and her children like his own brothers and sisters. Angesom and Merhawi viewed Abraham as a father or brother. The two families frequently socialized together and shared holidays, birthdays and family dinners.

## II. Abraham Gebreselassie's Death

In the early morning of March 1, 2006, Abraham, a seemingly healthy 42-year old, suddenly fell ill and died. Winta called 911, reporting that her husband was not breathing, then called her family and the Gebreselassies. An autopsy conducted by pathologist Thomas Rogers was inconclusive. A toxicology screen for prescription and street drugs was negative and there was no evidence of foul play.

Suspicious about their brother's sudden death, Asmerom and Tesfu met with Berkeley Police Sergeant Robert Rittenhouse to discuss their belief that Winta had a hand in it. Sergeant Rittenhouse reviewed the autopsy and 911 reports and interviewed Winta, Dr. Rogers, a second pathologist the Gebreselassies had retained to review Dr. Rogers' report, and a supervising investigator with the coroner's office. On August 11, Sergeant Rittenhouse told Asmerom and Tesfu that Abraham's death did not appear to be a homicide and that the police department did not intend to further investigate it.

Asmerom, nonetheless, remained suspicious. He believed the Meharis had two motives for murdering Abraham. They wanted to prevent him from disclosing that Merhawi Mehari was homosexual and to collect on Abraham's life insurance policy. Asmerom continued to urge Sergeant Rittenhouse and the insurance company to investigate his brother's death. And he repeatedly confronted the Mehari family. Twice in the late summer or fall he went to their apartment and questioned Winta's mother and brothers about the night Abraham died. According to Angesom, Yehferom and Merhawi,

Asmerom accused the Mehari family of murdering Abraham.  Concerned by these confrontations, the family decided that Asmerom was no longer welcome in their home and agreed to lock the door and call the police if he returned.[2]

Yehferom testified about another encounter with Asmerom, about six weeks before Thanksgiving, when Asmerom and Tesfu came to his workplace at Central Parking in Oakland.  Asmerom said he had discovered something about Merhawi.  Then, according to Yehferom, Asmerom said "You guys have murdered Abraham, I'm going to murder you," and insulted Yehferom and his family.  They left when Yehferom threatened to call the police.  Then, about 10 days before Thanksgiving, Asmerom and Tesfu approached Merhawi at the Oakland library.  Asmerom confronted Merhawi with e-mails from a gay website that he believed proved Merhawi was homosexual, and accused him of having molested their young nephew Issac.  According to Asmerom, Merhawi admitted he was homosexual and that he had molested Issac, and he begged Asmerom not to tell anyone.  According to Merhawi, Asmerom called Regbe a "prostitute" and said "[t]hat bitch mother of yours and you guys are the ones that killed my [brother]."  After speaking with Merhawi, Asmerom went to see Yehferom to tell him about Merhawi's sexual orientation "since [Yehferom] is the older sibling."  Asmerom testified that Yehferom "came with an attitude" and refused to speak with him.

Tewodros was not present on these occasions, never said anything derogatory to the Meharis, and conducted himself respectfully in their presence until Thanksgiving day 2006.  Merhawi testified that before the murders he saw Tewodros as a pacifist who wouldn't hurt a fly.  Tewodros testified that he and the Meharis, including Winta, Issac, Angesom, Merhawi and Yonas, continued to "constantly" visit each other at their respective homes between Abraham's death and Thanksgiving.  Tewodros was never told he was unwelcome at the Meharis' home.

Tewodros was aware of but did not share Asmerom's suspicion that the Meharis had killed Abraham.  His concerns, rather, were that an unknown outsider, possibly

---

[2] Asmerom, in contrast, testified that he continued to visit Regbe at her apartment up until the day before Thanksgiving.

someone Winta knew, might have murdered Abraham for the insurance proceeds and, if so, that Asmerom's continuing investigation could endanger the whole family. As a precaution the Gebreselassies changed the locks to each of their apartments, and Tewodros bought a gun.

### III.  The Murders of Winta, Regbe and Yonas

The Mehari family gathered at Regbe's apartment the afternoon of November 23, 2006 for Thanksgiving lunch.  Regbe, Winta, Issac, brothers Angesom, Merhawi, Yonas and Yehferom, and Misghina Gebreselassie, a cousin of Asmerom and Tewodros, were there.  Misghina had something to drink and left after a few minutes.  Tewodros arrived just before Misghina left.  He greeted everyone in the apartment, asked Angesom about his school, spoke with Yonas about college, and commented to Winta that Issac was growing up. Regbe invited Tewodros to eat with them.

Tewodros got a plate of food and sat on a chair next to the television.  Angesom, Yehferom and Winta were sitting on the couch across from him. Yonas was at a computer table near Winta.  Merhawi was on the phone with Yosef, the eldest Mehari brother, who lived in London.  Regbe sat on a stool next to the phone, using a small portable burner to prepare a traditional Ethiopian coffee ceremony.  Tewodros was playing with 2-year-old Issac, letting him open and shut his cell phone.

Much of what happened next was hotly disputed at trial, as will be seen.  What is undisputed is that Asmerom arrived at the Mehari apartment shortly after 3 p.m., armed with a nine-millimeter semiautomatic pistol.  Shots broke out.  Regbe, Yonas and Winta were killed, Yehferom was shot in the ankle, and Angesom was severely injured when he jumped from the third floor apartment to escape.

Either just before or after the shooting began, Tewodros grabbed Issac and fled to his mother's apartment.  Asmerom also returned there, called 911 and reported that he had shot several people in self-defense.  He begged the police to arrive quickly because people had been hurt.

Two guns were recovered from the apartment, a Lorcin 380 automatic that had been reported stolen from its registered owner and a Luger Kahr Arms 9 millimeter

registered to Mulugeta Gebreselassie. The Lorcin had six live rounds in its magazine but the chamber was empty. All of the fatal bullets and cartridge casings found at the scene of the shootings came from the Luger. Asmerom admitted bringing the Luger to the Meharis' apartment, but denied that he brought a second gun. Tewodros's cell phone was found by the chair where he had been sitting, next to Yonas's body.

## IV. Prosecution Case

The prosecution theory was that Asmerom murdered Winta, Regbe and Yonas as revenge for Abraham's death and Tewodros helped him when he signaled that the Meharis had all gathered, let him into their apartment, and then spirited Issac to safety before Asmerom opened fire. Asmerom admitted the shooting but asserted he did so in self-defense. His theory was that the Meharis had killed Abraham primarily to conceal Merhawi's sexual orientation, and that they lured him to their apartment to kill him for the same reason. With respect to Tewodros, the defense was that he knew nothing of Asmerom's plans and had no part in the murders.

### A. Angesom's Testimony

The state's case was supported primarily by the testimony of Angesom, Merhawi and Yehferom. Angesom testified he saw Tewodros walk toward the apartment door while speaking on his cell phone. He paced back and forth near the door for several minutes as Issac played around and between his legs. Then, Asmerom walked in and Tewodros left the apartment with Issac. Angesom could see part of the door from where he sat, but he did not see Tewodros unlock or open it. Other than Issac, none of the Mehari family members were anywhere near the front door. Asmerom was holding a gun in his right hand and a brown paper bag in his left. First he shot Yonas, then, as Regbe cried "my child" and reached toward him, Asmerom shot her too. At that point Angesom escaped by jumping head first from the living room window to the turf three floors below, seriously injuring his back and arm.[3]

---

[3] Angesom testified that he did not go into the bedroom or see any other family members do so. He did not remember telling his doctor in December 2006 that he jumped from the third story balcony, which is off the bedroom.

## B. Merhawi's Testimony

Merhawi gave the following account. Issac was playing with Tewodros's phone, opening and shutting it. Later Merhawi saw Tewodros talking on a cell phone, although he had not heard it ring. Tewodros was saying "Hello, hello, I can't hear you" and "Hello, Mulu, Hailu, hello, I can't hear you" as he walked toward the apartment's front door. Issac was with him. Tewodros unlocked the lower lock and tried to open the door, but the top lock was still locked. As Tewodros reached to unlock it, the house phone rang and Merhawi crossed the room to answer it. The caller was his brother Yosef. After the two chatted briefly, Yosef asked to speak with Regbe.

Merhawi could not see the front door or Issac and Tewodros from where he was standing. He did not see Tewodros unlock the upper lock or open the door. But Asmerom came in and started shooting. First he shot Yonas, then Regbe. Winta got up from the sofa, and Asmerom shot and killed her. Merhawi did not see what happened to Angesom once the shooting started. One minute Angesom was standing up, and the next he was gone. He did not see Angesom jump out the window or move towards the bedroom. Yehferom grabbed Asmerom's hand and they struggled over the gun. Merhawi followed and grabbed Asmerom from behind. Asmerom backed into the hallway and fled.

Merhawi had never owned a gun, had never seen any of his family with a gun, and none of them had a gun the day of the murders. He denied that his family invited Asmerom over for Thanksgiving to murder him so that he could not expose Merhawi's sexual orientation or continue to investigate Abraham's death. Merhawi confirmed that Tewodros knew Issac liked phones and had given him a phone to play with on Thanksgiving. He denied that his mother opened the door for Asmerom.

## C. Yehferom's testimony

Yehferom testified that Tewodros was playing with Issac, holding his phone and playing different ring tones, when he started talking on the phone as if he had received a call. He walked toward the front door saying "Who's this? Who's this? I can't hear you." After pacing back and forth by the door he unlocked both locks, opened the door

and carried Issac out of the apartment. Asmerom came in carrying a gun in his right hand and a plastic bag in his left hand. He said "[y]ou've killed Abraham and I'm going to kill you" and shot Yonas, Regbe and Winta. Yehferom saw Angesom pass by on his right toward the living room window just after Regbe fell. Yehferom struggled with Asmerom and grabbed the gun away from him, but Asmerom pulled a second gun from his waistband. Yehferom was shot in the ankle during the struggle, but managed to get the second gun away from Asmerom and pushed him toward the hall.

## D. The Initial Investigation

Questioned by police the day of the murders, Merhawi said that Tewodros fled the apartment with Issac after the first shot was fired, but Yehferom said they left before Asmerom came in. Yehferom told police that Asmerom came in saying "Everybody here killed Abraham, I'm going to kill you," but Merhawi said that Asmerom said nothing. Merhawi told police that Asmerom had one gun. Yehferom said Asmerom entered holding two silver handguns. When asked whether Asmerom fired both of the guns or just one, Yehferom said just one, and added that Asmerom was carrying a gun in his right hand and a plastic bag in his left. There were no records indicating that police looked for or found a plastic bag at the crime scene.

Asmerom and Tewodros were questioned by homicide police early the morning of November 24. Tewodros waived his Miranda rights and spoke with Sergeant James Morris for about three hours, of which only 21 minutes were taped. He explained that he had suspected foul play was involved in Abraham's death, but "kept everything inside." Regbe had invited him to Thanksgiving when he ran into her and Winta the day before. On Thanksgiving he was playing with Issac when he heard Yehferom yelling at Asmerom. He did not know that Asmerom was coming over or who opened the door to let him in. Yehferom pulled out a gun and Asmerom started shooting in the air. Tewodros heard one shot, grabbed Issac and ran.

Asmerom was questioned for just over an hour, about half of which he spent talking about his belief that the Meharis killed Abraham. Concerning the shootings, he initially told Sergeant Morris that Regbe opened the door for him and then stood there,

8

but he later said that she sat down after letting him in. He admitted the shootings. He said that Winta was "evil," that the events of November 23 happened because Merhawi was a homosexual, and that the Meharis "maybe" murdered Abraham to conceal Merhawi's homosexuality. He knew the Meharis planned to kill him to prevent him from revealing Merhawi's lifestyle and that Winta invited him to Thanksgiving to "set him up."

Oakland Police Officer Jason Sena interviewed Yehferom around 5:00 p.m. that evening. Yehferom said Tewodros had been in the apartment for a short period of time and then made a call, opened the door for Asmerom, and left with Issac as Asmerom entered. Asmerom came in holding two guns and started shooting.

### E. Hailu Legsse and Mulu Reda

Hailu Legsse and Mulu Reda, a married couple, also lived in the Keller Plaza complex and were acquainted with the Mehari and Gebreselassie families. Both testified that Tewodros did not call them on November 23, 2006.

### F. Cell Phone Records

The prosecution theorized that Tewodros signaled Asmerom to come over to Regbe's apartment by calling another brother, Dawit Gebreselassie, who was with Asmerom in their mother's apartment. There were no calls between Tewodros and Asmerom on the day of the shooting. Records for Tewodros's phone showed two calls were placed to Dawit's number on November 23, one at 2:57 p.m. and the second at 3:04 p.m. The first call connected for 3 seconds but could have gone to voice mail or was unanswered. The second call went through, but the connection time was zero seconds.

Michael Dikovitsky from Metro PCS cell phone services testified that Tewodros's phone would call the last number dialed if someone flipped it open and twice hit the "send" button. Dikovitsky testified that to speed dial a call required first pressing the assigned speed dial number, followed by the "send" key, then "end call." He did not know whether opening and closing the phone would activate or deactivate the speed dial. But Raymond MacDonald, a manager with T-Mobile's law enforcement relations group, also testified about one-touch dialing with Tewodros's phone. According to MacDonald,

9

one simply needs to hit and hold down a single key to speed dial a call; it was not necessary to press send as well.  MacDonald also testified that closing the phone would end the call.

## IV. Defense Cases

### A. Asmerom's Testimony

Asmerom testified in his own defense.  He said that on November 10, 2006 he told Merhawi he had proof Abraham was murdered, and that he would not expose Merhawi's homosexuality if he confessed he was present when Winta killed Abraham.  Merhawi admitted to Asmerom that Winta poisoned Abraham to keep him from exposing Merhawi's homosexuality and for the insurance money.  He, Yonas, and Angesom were there when Abraham died.  Three days later Asmerom told Merhawi he had changed his mind and intended to expose Merhawi's homosexuality to his family and church.

On November 20 Asmerom sent Winta a letter with "proof" that her brother was homosexual, and proposed they hold a family discussion about it.  The next day he saw Winta at Keller Plaza.  She admitted Merhawi was homosexual and, further, that he had molested Issac.  At Asmerom's urging, Winta invited him to meet with the Meharis to discuss the families' problems at Regbe's apartment when they gathered for Thanksgiving.

But Asmerom grew suspicious about Winta's invitation that he come alone.  He believed that she and her family might be planning to kill him to keep him from exposing Merhawi's homosexuality and the truth about Abraham's death, so he brought his gun to the meeting to defend himself.

Asmerom knocked at the apartment door.  Regbe, not Tewodros, opened it for him.  Tewodros was sitting in the living room next to Issac; Asmerom had not known Tewodros would be there.  Yehferom and Merhawi almost immediately started cursing at him and Merhawi threatened to "knock [him] down."  Asmerom started to  back out of the apartment, but Merhawi drew a gun from his waistband.  Asmerom pulled out his own gun, told Merhawi to put his weapon down, and fired a warning shot toward the window.

10

Everybody ducked, including Merhawi.  At that point Asmerom saw that Yehferom also had a gun, on the sofa.  Scared, he said "If anybody moves, I'm going to kill you."  Tewodros grabbed Issac and left.  Yehferom picked up his gun.  Asmerom fired in his direction.  Everything became chaotic.  Merhawi ran towards Asmerom with his gun drawn.  Asmerom shot toward Merhawi, then shot Regbe as she tried to grab him.  Regbe wanted to kill Asmerom for the same reason the Meharis killed Abraham: to hide Merhawi's homosexuality.  Winta then came at Asmerom,  screaming and saying "it's our fault, our fault," so he shot her too.  He did not want to kill her, but she was blocking his way.

Yehferom grabbed Asmerom's hand.  Asmerom's gun went off.  He saw that Yehferom was also holding a gun.  He dropped his weapon and struggled with Yehferom, knocking the gun from his hand.  The struggle continued until Asmerom distracted Yehferom by pretending he had a second gun in his waistband and managed to flee to his mother's apartment.

### B. Tewodros's Testimony

Tewodros testified that he ran into Regbe and Issac on the street on Thanksgiving morning.  He told Regbe he would stop by later, and she welcomed him.  Tewodros neither told Asmerom he was planning to visit the Meharis nor knew his brother would be there.  Asmerom did not ask him to be there and open the door for him.

When Tewodros dropped by on Thanksgiving day, the Meharis were watching football and Regbe was making and serving coffee.  Everyone was friendly, but Tewodros felt they were nervous.  Regbe gave him coffee and food.  After he ate, Tewodros sat on a chair near the television.  Issac had been playing with his cell phone most of the time since he arrived at the apartment.  Tewodros was bouncing Issac in his lap when Regbe and one of the twins got up.  Yehferom yelled "what the hell are you doing here?"

Tewodros looked up and saw Asmerom.  When questioned after the murders he said he did not see who opened the door for Asmerom, but he guessed it was Regbe because she was close to the door.  Asmerom said something like "Winta, what's going

11

on." Yehferom pulled a gun, then Asmerom said "drop your gun" and fired toward the window. He did not see Asmerom pull the gun out. He heard a shot and then saw a gun in his brother's hands. Nor did he see Yehferom aim or fire his gun. Tewodros ducked, then fled the apartment with Issac.

Tewodros had purchased his Metro PCS flip phone about two months earlier under an assumed name to preserve his anonymity when he visited political chat rooms. His brother Dawit's phone number was programmed into the phone so that it could be speed-dialed by pressing and holding the number assigned to it for a few seconds or less. Closing the phone would end the call. It was possible that Issac inadvertently pressed Dawit's number when he was playing with the phone.

Tewodros had called Dawit earlier on November 23, but he did not call him, or anyone else, from Regbe's apartment. He did not pretend to have a phone conversation and did not say "Mula, Mula" or "Hailu, Hailu." Issac was playing with the phone most of the time. Sometime later Tewodros realized the phone had been left behind in the Meharis' apartment, but he had no idea whether he left it or Issac was playing with it and left it there. He did not throw or kick the phone back into the apartment as he fled.

A couple of months before Thanksgiving, Tewodros bought a gun and changed his family's locks for protection. He registered the gun in his name, kept it in his mother's closet and never took it outside.

Asmerom told Tewodros in November that the Mehari family had murdered Abraham to hide Merhawi's homosexuality. Tewodros believed this was true. He was worried that Merhawi would molest Issac and felt that, as a homosexual, Merhawi should not be active in the church. Nonetheless there were no problems between himself and the Meharis before November 23, and he and the Meharis frequently visited each other's homes. They did not discuss the Gebresalassies' suspicions about Abraham's death, although everyone knew that Asmerom was still investigating it. After the murders Tewodros told the district attorney that Asmerom and the Meharis did not get along, but at trial he testified that he only meant the Meharis were uncomfortable around Asmerom because of his investigation.

## V. Verdicts

Asmerom and Tewodros were each charged with three counts of murder, attempted murder, kidnapping and false imprisonment by violence. After three months of trial and six days of deliberations, the jury found both defendants guilty on all counts. Both were sentenced to multiple consecutive life terms without the possibility of parole. Both filed timely appeals.

## DISCUSSION

### Asmerom's Appeal

### I. Issues Regarding Representation

Asmerom raises three issues related to his representation at trial. First, he asserts the trial court erroneously refused to let him substitute in newly retained private counsel before the trial started. Then, he contends, after he successfully moved to represent himself, the court committed further error by denying his requests for a continuance to prepare his case. Finally, Asmerom asserts the court violated his constitutional right of self-representation when it later terminated his pro se status. Having carefully reviewed the extensive record, we are satisfied that none of these points have merit.

### A. Choice of Counsel

We turn first to Asmerom's assertion that the trial court violated his constitutional right to counsel of his choosing when it denied his request to substitute in new private counsel before the trial started. We disagree.

### 1. Background

Asmerom was initially represented by Ray Plumhoff and Marvin Lew from the Office of the Public Defender. In August 2008 he unsuccessfully moved for new counsel under *People v. Marsden* (1970) 2 Cal.3d 118. In September 2008, William DuBois stated his intent to substitute in as privately retained counsel. The court cautioned Mr. DuBois that "given the fact that this case is now about two years old, . . . it's going to be my intention to get this case tried by mid-2009" and that "[g]iven the amount of litigation that occurred in this case before this arraignment, I do not anticipate that it should take too long for you to be ready for trial." Mr. DuBois concurred.

13

After delays occasioned in part by Mr. DuBois's commitments on other trials, on June 5, 2009 the court again remarked on its prior intention to start trial in July. Nonetheless, it continued the case until August 17 due to Mr. Du Bois's "medical issues that have to be dealt with." Then, on August 4, Asmerom wrote to the court complaining that Mr. Du Bois was too busy to pay attention to his case and was only "after money." The letter also complained that former counsel Plumhoff "didn't do his best during the prelim hearing, that's why I am bound to trial." A week later Du Bois moved to withdraw as counsel on the ground of an irremediable breakdown of the attorney-client relationship. The court granted the motion, and on August 31 reappointed Mr. Lew over Asmerom's protests that he had a conflict of interest with the public defender and that Lew was not his attorney. In October Asmerom retained William Cole as his new attorney and the court relieved Mr. Lew.

Mr. Cole's representation was also short-lived. On December 1, 2009, at Asmerom's request, the court relieved Mr. Cole and again reappointed the Public Defender to represent him. The court warned Asmerom that "I will not let another lawyer in the case. We're going to set a trial date on December 18th. I'm not going to let another lawyer in the case unless they are able to go to trial on that date. You need to understand that, I don't want you to be surprised." On December 18 the court set trial for May 3 and instructed counsel to block out their calendars through at least June.

On May 27 Asmerom brought another *Marsden* motion once again to remove Plumhoff and Lew. He told the court " 'My public [defenders] have revealed or have given defense evidence to the prosecutor. They are an agent of the District Attorney. The way my attorneys have dealt with my case is incompetence and intentional to hurt my case. They violated their duty of loyalty to me. Their primary motive is their personal interest rather than to represent their client.' " After exploring Asmerom's specific complaints, most of which seemed to concern evidence he felt his attorneys were not properly addressing, the court denied the motion.

On June 21 Asmerom's attorneys declared a doubt as to his competence. Mr. Lew explained their concerns were "specifically in regards to his ability to rationally assist

counsel . . . in preparation of his defense pursuant to Penal Code section 1368, et seq. [¶]. . . [¶] Mr. Gebreselassie's potential testimony in this matter is critical to his defense of self-defense. He has been unable to prepare to testify because of his preoccupation with matters which we believe are properly characterized as paranoid delusions. These things have prevented Mr. Gebreselassie from preparing his testimony as well as preventing him from preparing other aspects of his defense with our cooperation." Asmerom's delusional thinking was said to include beliefs that his attorneys were colluding with the District Attorney out of racist animus; that they were sabotaging his defense because (he believed) they were homosexual and therefore in league with two gay witnesses [presumably Angesom and Merhawi]; and that they possessed, but refused to present, "categorically irrefutable" evidence that the Meharis killed Abraham. Asmerom had refused to speak with counsel since June 9 because of his delusions about their allegiance with the prosecution.

The court suspended proceedings for a psychological evaluation and took the *Marsden* motion under submission. At a July 12 hearing Asmerom continued to detail his complaints about attorneys Lew, Plumhoff, Cole and Du Bois. Lew and Plumhoff felt they could continue representing Asmerom pending the competency evaluation. On July 26 the court granted the *Marsden* motion and relieved Lew and Plumhoff. The court explained that "the disagreements here signal a breakdown that is such a magnitude that I don't think that, even though you two are outstanding lawyers, I don't think [Asmerom] can get a fair trial if you guys are representing him. Because I think—whether the delusions or non-delusions, his state of mind is such as it relates to both of you that he will not cooperate, he will order his family not to cooperate. . . ."

After contacting the court-appointed counsel panel, the court provisionally assigned Mr. Du Bois to represent Asmerom on the understanding that Du Bois had other commitments, would need the court-appointed counsel panel to provide backup counsel, and would inform the court the following week whether he could take on the representation. But on August 4, Asmerom announced he had retained private counsel, Mr. Lefcourt. The court, however, had been informed that Lefcourt had declined to take

15

the case, and continued Du Bois as Asmerom's counsel subject to confirming that the appointed counsel panel could meet his requirements for fees and backup counsel. Du Bois anticipated he would need four months to prepare for trial. Four days later, Mr. Lefcourt confirmed that he would not represent Asmerom.

On August 18 Mr. DuBois declined the appointment because the appointed counsel program had not met his support requirements. Asmerom's family had retained Mr. Lefcourt contingent on his obtaining county funding for investigation, expert witnesses, transcripts and other defense costs. But on August 31 Lefcourt informed the court he would be out of the country from September 2 until September 20 and would apply for funding for defense costs only after his return. Lefcourt estimated trial preparation would take six months after that due to his heavy client load and trial schedule.

On September 2 the court stated its intention to obtain a court-appointed lawyer for Asmerom. It explained: "[I]n light of the fact that Mr. Lefcourt has made at least five special appearances, has not—is not yet prepared to make a general appearance; in light of the fact that at least three to four boxes of discovery [have] been sitting untouched in my courtroom since sometime in—since the latter part of July, 1st part of August, and it is now September 2nd; in light of the fact that there have been continuing motions by Tewodros to sever this matter. And as I indicated yesterday, I believe that both defendants have an agenda here to try to [game] the system to get separate trials; in light of the fact that this trial is most definitely one that is anticipated or perceived by the people who wrote the law on joinder that this basically would be the same case tried twice if it was tried separately, we're going to get this case moving with or without Mr. Lefcourt. If he can meet the schedule that we're going to put together, then he most definitely can continue to represent Mr. Asmerom Gebreselassie.

"But based upon the fact that he has made the special appearances, has not ascertained whether or not he can get public funds for ancillary services; based on the fact that yesterday he gave us a six month—his associate, because he was too busy to show up, gave us a six month estimate for trial without having looked at any of the

16

materials that we have here in this courtroom for discovery; and also, the fact that he's going to be preparing a declaration for ancillary fees without having looked at the information that are in these files to ascertain what ancillary services, investigation, so forth, has already been done, the totality of that leads this court to believe that it would be the best interest of all parties to have court appointed send us a lawyer."

The court appointed Darryl Stallworth to represent Asmerom, over Asmerom's objection, after Stallworth confirmed he could be ready for trial by January. Mr. Lefcourt had "sort of been hovering on this case," the court noted, but had not committed to take it, had not made a general appearance, had not reviewed the court files, and had not made a request for ancillary funds. "So I don't know what Mr. Lefcourt is going to do. [¶] I now have a more than able and competent attorney from court-appointed who indicates he can be ready to go with jury selection starting December 1st and then trial starting January 3rd. [¶] I also would indicate that Mr. Lefcourt's associate, having looked at the file, threw out the number that Mr. Lefcourt would need six months to prepare for this case. I don't know how they came to that number since nobody's looked at anything. [¶] I would also note that Mr. Lefcourt indicated his associate indicated, he had two no-time waiver trials in San Francisco, one starting on October 8th and then one trailing after that date. So I don't know if that puts him into April, May or June." The court appointed Mr. Stallworth with the proviso that Mr. Lefcourt could take over if he could obtain county funding for Asmerom's defense costs and comply with the trial schedule.

On September 27 Asmerom moved to substitute Mr. Lefcourt in as counsel, subject to obtaining public funding for defense costs and "the setting of a reasonable trial schedule." Lefcourt acknowledged the December trial date was incompatible with his request for six months to prepare, but argued the court could either sever Tewodros's case or find good cause to continue the trial for approximately three more months.[4] The court was unpersuaded. It noted that Mr. Lefcourt had been "dabbling" in the case for almost two months "and you still can't tell me exactly when you are going to be

---

[4] Tewodros revoked his time waiver in June or July, and the 70th day ran in early September 2010.

17

ready. . . . [Y]ou are now asking me to postpone this case until May to allow you to come into the case, try several other cases in the meantime, which means you won't be working on this case. You haven't read the preliminary hearing transcript, you haven't picked up the discovery. You haven't read enough of this case to know even what you are asking for in terms of ancillary costs." The court noted the "great amount of difficulty with Asmerom in terms of his unhappiness with prior counsel" and predicted that, if it allowed yet another substitution, Asmerom would attempt to dismiss Mr. Lefcourt as well when trial approached. The court found that "continu[ing] the case for another 7 or 8 months at this point does an injustice to the orderly administration of justice to the co-defendant, as well as to the prosecution and their witnesses." Accordingly, it rejected Asmerom's bid to replace Mr. Stallworth with Mr. Lefcourt. This is the ruling Asmerom now challenges as constitutional error.

### 2. Analysis

"The right of a criminal defendant to counsel and to present a defense are among the most sacred and sensitive of our constitutional rights. [Citations.] While we have recognized competing values of substantial importance to trial courts, including the speedy determination of criminal charges, the state should keep to a 'necessary minimum its interference with the individual's desire to defend himself in whatever manner he deems best, using any legitimate means within his resources' [Citation]. A criminal defendant's right to decide how to defend himself should be respected unless it will result in 'significant prejudice' to the defendant or in a 'disruption of the orderly processes of justice unreasonable under the circumstances of the particular case.' [Citation.] In other words, we demand of trial courts a 'resourceful diligence directed toward the protection of [the right to counsel] to the fullest extent consistent with effective judicial administration.' " (*People v. Ortiz* (1990) 51 Cal. 3d 975, 982–983.)

But, as explained in *People v. Keshishian* (2008) 162 Cal.App.4th 425, 428, the right to retained counsel of choice is not absolute. " '[T]he "fair opportunity" to secure counsel of choice provided by the Sixth Amendment "is necessarily [limited by] the countervailing state interest against which the sixth amendment right provides explicit

protection: the interest in proceeding with prosecutions on an orderly and expeditious basis, taking into account the practical difficulties of 'assembling the witnesses, lawyers, and jurors at the same place at the same time.' " ' [Citation.]" (*People v. Keshishian, supra*, 162 Cal.App.4th at p. 428.) Thus, " ' "The right to counsel cannot mean that a defendant may continually delay his day of judgment by discharging prior counsel," ' and the court is within its discretion to deny a last-minute motion for continuance to secure new counsel." (*Id*. at p. 429.) "A court faced with a request to substitute retained counsel must balance the defendant's interest in new counsel against the disruption, if any, flowing from the substitution. [Citations.]" (*People v. Lara* (2001) 86 Cal.App.4th 139, 153; see also *Stevens v. Superior* Court (1988) 198 Cal.App.3d 932 [affirming trial court's decision to relieve retained counsel whose scheduling conflicts would have forced six-month continuance].)

The court's decision here to disallow a further change of counsel was a valid exercise of its discretion. The history described above shows the court carefully balanced Asmerom's request to bring Mr. Lefcourt in against his extensive history of dissatisfaction with, and termination of, a series of qualified attorneys; the resulting delays and disruption to the judicial process; and the prejudice to Tewodros, the prosecution, and witnesses that would have resulted from allowing yet another substitution. Its ruling did not impinge on Asmerom's constitutional rights to counsel of his choice.

Asmerom relies heavily on *People v. Courts* (1985) 37 Cal.3d 784, but this is a very different case. The defendant there entered a plea on July 19, 1982, and started discussing representation with a private attorney in September. Over the ensuing month he arranged funding to hire private counsel, and on October 21, 1982, paid a retainer to attorney Swartz. He then moved for substitution of counsel and a continuance of the October 26 trial date to allow new counsel to investigate and prepare for trial. (*Id*. at pp. 787–789.) The court of appeal held the denial of those requests was an abuse of discretion. The defendant had requested only one prior continuance and engaged in a good faith, diligent effort to obtain new counsel in a timely fashion. Moreover, there was

19

no indication that the requested continuance would significantly impinge on judicial efficiency or inconvenience the court, the parties or the jurors. (*Id*. at pp. 791–794.)

Here, in contrast, Asmerom's dissatisfaction with a series of prior attorneys had already caused substantial delay by the time he moved to retain Mr. Lefcourt. He had filed at least three *Marsden* motions while represented by the public defender's office and fired two private attorneys, one of whom, Mr. DuBois, he later attempted to rehire. Although the case was over four years old, Mr. Lefcourt seemed to be making no haste to jump in and wanted another six months after a trip abroad to prepare for trial. With this history, the court found that further delay for another substitution of counsel would unacceptably disrupt the trial process and impede Tewodros's statutory speedy trial rights. The court also surmised, not unreasonably on this record, that Asmerom was exploiting his right to counsel of choice to "try to [game] the system" in order to obtain a severance. " 'The right to counsel cannot mean that a defendant may continually delay his day of judgment by discharging prior counsel.' " (*People v. Rhines* (1982) 131 Cal.App.3d 498, 506.) The court appropriately balanced Asmerom's right to counsel of his own choosing against the interest of the People, the court and the co-defendant in an expeditious resolution of the case.

## B. Asmerom's Post-*Faretta* Request for a Continuance

Asmerom contends the trial court erred when it denied requests for continuances after granting his *Faretta*[5] motion to represent himself at trial. We disagree.

### 1. Background

On November 29, 2010, the day the trial was set to begin, Tewodros's attorneys were unexpectedly tied up in another trial. The court found good cause to continue the trial until January 3. At that same hearing, Asmerom made another *Marsden* motion,[6] and, after it was denied, moved under *Faretta* to represent himself. The trial court granted the motion, appointed Mr. Stallworth to serve as advisory counsel, and directed

---

[5] *Faretta v. California* (1975) 422 U.S. 806.

[6] At a hearing on December 16, the court noted Asmerom had brought at least six *Marsden* motions; Asmerom thought there had been eight or ten.

him to provide Asmerom with appropriately redacted case files. Asmerom was fully cautioned that the January 3 trial date would not be continued "whether you're ready to go or not."

On December 16 Asmerom requested an additional three months to investigate allegedly newly discovered evidence—the 911 tape from the night Abraham died—but said he was nonetheless ready to go to trial on January 3, or even "tomorrow." Advisory counsel concurred that the defense preparation could be done by January 3 or January 10. The court continued the trial to January 10 and denied Asmerom's request for three more months, noting that the defense had been on notice of the 911 tape for at least eight months and had ample time to complete its investigation before January 10.

During the first week of January 2011 Asmerom again sought a continuance, this time to review discovery materials he claimed had not been provided to him and to hire an expert to examine the 911 tape. The trial court found the January 10 trial date allowed sufficient time for Asmerom's needs, and, specifically, that it provided adequate time for an audio expert to analyze the 911 tape before Asmerom's defense case. Asmerom also renewed his bid to retain Mr. Lefcourt as defense counsel and asked for a five or six month continuance for Mr. Lefcourt to prepare. The court denied this request as well.

## 2. Analysis

"The decision to grant or deny a continuance normally rests within the sound discretion of the trial court. [Citation.] While it is true that a defendant who chooses to conduct his defense in pro. per. does so subject to the disabilities normally attendant upon the status as a prisoner [citation], a pro se defendant must be given a reasonable opportunity to prepare a defense. [Citations.] The denial of a proper request for a continuance to prepare a defense constitutes an abuse of discretion and a denial of due process." (*People v. Cruz* (1978) 83 Cal.App.3d 308, 324–325.) The erroneous denial of a defendant's request for a continuance after being granted in propria persona status is "usually treated as prejudicial per se." (*People v. Hill* (1983) 148 Cal.App.3d 744, 758.)

There was no abuse of discretion here, because Asmerom was not denied a reasonable opportunity to prepare his defense. (See § 1050, subd. (e) [continuances

21

granted only for good cause]; Cal. Rules of Court, rule 4.113 [motions to continue criminal trials are disfavored and denied unless movant proves the "ends of justice" require continuance].)  The case had been pending for over four years, during which time Asmerom actively participated in preparation for his defense.  He did not show he could not complete his investigations of the 911 tape by January 10.  Despite his complaints about access to discovery materials, both he and his advisory counsel assured the court in mid-December that they could be ready for trial by January 3.  Moreover, Asmerom's tortuous history of changing representation supported a reasonable inference that Asmerom was attempting to exploit the *Faretta* mandate as yet another means of delaying the trial.  The court manifestly did not abuse its discretion in denying the continuance.

### C.  Revocation of Asmerom's Right to Self-Representation

On February 16, 2011, 25 days into the trial, the court terminated Asmerom's right to represent himself due to his repeated inappropriate outbursts and other misconduct in court.  Asmerom contends this was error, and that the error was prejudicial per se.  To the contrary, the trial court properly revoked Asmerom's right to self-representation.

### 1. Background

Asmerom was cautioned when he was granted pro per status that he would have to act appropriately during trial or the court could terminate his right to self-representation.  "You also understand, the other part that concerns me a little bit that you, again, tend to get a little verbose and a little worked up when you get agitated.  And when you're before the trial judge and he decides that you stepped over the line, he can terminate your pro per privileges right in the middle of trial and assign you a lawyer, and that very seldom looks good to the jury.  They're going to go, wow, all of a sudden this guy's messed this up so bad and now he's got a lawyer.  That generally works to the detriment of the case."  Asmerom acknowledged that he understood.

During jury selection, with the jurors outside the courtroom, Asmerom engaged in a prolonged and heated diatribe accusing the Meharis of murdering his brother and the prosecutor, the trial court and District Attorney Nancy O'Malley of being prejudiced

22

against him. The outburst resulted in his removal, yelling and screaming, from the courtroom. When Asmerom was brought back the next day, the court warned him he would be removed again if there were further outbursts.

Angesom Mehari was the state's first important witness. During cross-examination, Asmerom, acting as his own counsel, accused him, rather dramatically, of murdering Abraham: "The question is you were there participating in Abraham's murder!!! You were there at Abraham's house killing my brother!!! Tell the truth!!!" The court warned him "I don't want another outburst like that. If you do that again, you know what the consequences [are]."

Things deteriorated the next day. When the court instructed Asmerom to move to another line of questioning, Asmerom exclaimed, "I have never seen this kind of justice." The trial court admonished him to keep quiet, but he continued: "I'm not going to keep quiet. That's my life. That's my life. The jurors has the right to know everything. You're arguing justice. You're prejudiced. That's my life. I have a right to defend the way I want to defend. The jury knows that he's prejudiced." The court excused the jurors and admonished Asmerom. "I've warned you before. You continue not to follow my instructions. You're disrespecting the Court. You're disrupting the trial. So until you can do that and keep your words to yourself, you are out of here. So he's out of here." Before Asmerom could be removed, he responded: "It doesn't matter. You are trying to give my case to my adversary [sic] counsel. No problem. You're a prejudiced person. We all know that. You are acting like a DA."[7]

Later that day Asmerom's advisory counsel sought clarification about his role in light of Asmerom's absence from the courtroom. The court explained it had not yet decided whether to revoke Asmerom's pro per status and intended to review the case law. The next day, Asmerom accused the court of disliking and disrespecting him, offending his family, and trying to revoke his pro per status "from the beginning." The court terminated his self-representation. It explained: "There's certainly a component of

_____

[7] The prosecutor heard this last statement as "You're acting like a dick."

23

emotional instability, and that's been demonstrated with his outbursts. [¶] Now, it's not sufficient for a 1368; however, I do think there are some components there . . . . [¶] . . . Number one is the nature of the misconduct as stated—or as on the record. The Court had ordered him to move on. This was yesterday, to another subject matter. He refused, continued not to follow the Court's rules, regulations . . . . [¶] And then as the jurors were walking out, filing out, made several comments to the Court. For example, 'You're prejudiced. You're a prejudicial person. We all know that. You're acting like a DA.' [¶] . . . It was also the outburst during the jury selection process which evidence[d] some emotional instability. On cross-examination of the first three witnesses, the Court has continuously and constantly ordered him to ask questions and not make self-serving gratuitous statements. [¶] And in terms of the impact of the misconduct on the trial proceedings, not only is it delaying the trial, but I am afraid that it has an effect on the jury and how the jury views him versus the evidence presented. [¶] I think it clearly subverts the Court's integrity of the trial and severely compromises the Court's ability to conduct a fair trial. . . . [T]he impact on the trial is to the extent that the codefendant [has] filed a motion to sever. And in the preliminary reading it looks like it was preliminarily focused on the outbursts during jury selection and then what happened yesterday."

The court also noted its futile admonitions to follow court rules and procedures throughout the trial, Asmerom's apparent attempt to intimidate Angesom during cross-examination, and the lack of suitable alternative sanctions. It then terminated Asmerom's pro per status and appointed his advisory counsel to represent him for the remainder of the trial.

### 2. Analysis

The right of self-representation, rather than absolute, is subject to forfeiture whenever " 'deliberate dilatory or obstructive behavior' threatens to subvert 'the core concept of a trial [citation] or to compromise the court's ability to conduct a fair trial." (*People v. Carson* (2005) 35 Cal.4th 1, 10, citing *United States v. Dougherty* (D.C. Cir. 1972) 473 F.2d 1113, 1125–1126 and *Illinois v. Allen* (1970) 397 U.S. 337.) As observed in *Faretta*, "the trial judge may terminate self-representation by a defendant who

24

deliberately engages in serious and obstructionist misconduct. [Citation.] Of course, a State may—even over objection by the accused—appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary." [Citation.] [¶] 'The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law.' " (*Faretta, supra*, 422.U.S. at p. 834, fn. 46; see also *People v. Carson*, *supra*, 35 Cal.4th at p. 8.)

When circumstances warrant, the trial court must thus decide "whether a defendant is and will remain so disruptive, obstreperous, disobedient, disrespectful or obstructionist in his or her actions or words as to preclude the exercise of the right to self-representation." (*People v. Welch* (1999) 20 Cal.4th 701, 735.) While each case must be evaluated in its own context and on its own facts, relevant factors may include the nature of the misconduct and its impact on the trial proceedings, the availability and suitability of alternative sanctions, whether the defendant has been warned that particular misconduct will result in termination of in propria persona status, and whether the defendant has intentionally sought to disrupt and delay the trial. (*People v. Carson, supra*, 35 Cal.4th at p. 10.) "The trial court possesses much discretion when it comes to terminating a defendant's right to self-representation and the exercise of that discretion 'will not be disturbed in the absence of a strong showing of clear abuse.' " (*Ibid.*)

The court properly exercised its discretion here. Asmerom was argumentative, insulting and disrespectful to the court, and either unable or unwilling to control his outbursts and abide by courtroom rules and protocol despite multiple warnings that failure to do so would result in the termination of his right to represent himself. " '[T]rial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case.' . . . [W]hen a defendant's obstreperous behavior is so disruptive that the trial cannot move forward, it is within the trial judge's discretion to require the defendant to be represented by counsel." (*United States v. Brock* (7th Cir. 1998) 159 F.3d 1077, 1079.) This is such a case.

## II. Admission of Entries From Winta's Laptop
### A. Background

In May 2010, Asmerom's public defender moved in limine to exclude a one-page document containing what appeared to be two diary entries recovered from Winta's laptop computer, the first expressing love for her deceased husband and the second concern about her poor treatment by the Gebreselassie family. Defense counsel sought to exclude both entries on the ground, among others, that they were impermissible hearsay. When the trial began, Asmerom incorporated this and other in limine motions filed by his former counsel in his response to the prosecutor's motions in limine.

When the motions were argued on January 10, 2011, no one could locate a copy of the printed-out diary entry. Asmerom confessed he "had no clue about this one. I didn't see it or read it. I have to wait." The prosecutor said the People did not intend to introduce the document during their case in chief, but "if the defense opens the door suggesting . . . Winta murdered Abraham, then I would be asked to be allowed to bring it in." The court postponed ruling on admissibility "until we find out what it is."

At trial, Asmerom continued to espouse his view that Winta and her family had murdered Abraham. The following exchange took place on April 13, during the prosecutor's cross-examination of Asmerom: "Q. After March 1st, 2006, you believed that Winta did not love Abraham; isn't that true? [¶] A. Miss Leventis, if a person, a lady, kills her husband, how do you assume she loves him?" The prosecutor then asked Asmerom about the "diary entry that [Winta] put in her computer for her love for Abraham." Asmerom described it as a "fake." Slightly paraphrasing passages from the note, the prosecutor asked: "Isn't it true that she said, 'I'm angry and sorry that I didn't tell my husband often enough how much I truly love him. Sorry because I didn't spend enough time with him, help him, enjoyed every minute with him. I was too busy going to school as if I was guaranteed to have tomorrow with him. I'm angry because I didn't have a brother or a sister for Issac. So now I'm trying very hard not to put off, hold back or save anything that would add laughter to my son and my family lives. And every morning when I open my eyes I tell myself that every day, every minute, every breath

truly is God's gift.' You know she said that after Abraham died, don't you?" Asmerom again responded the note was "garbage" and "a fake."

Soon after that, the prosecutor asked Asmerom if he knew Winta's relationship with the Gebreselassie family became strained after Abraham died. When Asmerom responded that it had not, the prosecutor was permitted to bring in the second diary entry to prove Asmerom was lying when he said there were no problems between Winta and the Gebreselassies. The prosecutor read the entry, dated September 8, 2006, in which Winta described her frustration that Tesfu Gebreselassie was withholding papers she needed for her taxes and, more generally, that the Gebreselassie family was treating her unfairly.[8]

Asmerom testified that he did not learn of the diary entries until his attorney received them in discovery, and that they did not change his view that Winta did not love Abraham. The prosecutor subsequently referred to and quoted both entries in arguing to

---

[8] " 'Friday, can't sleep much in the very early mornings like after 5:00 o'clock a.m. thinking about paper work for the garage such as tax papers. Had a good morning and afternoon since mother came and made coffee. It is file day today. I had called Tesfu yesterday, but he called me this morning and I asked him to give me some papers to prepare 2005 tax paper. Called me in the evening when I was about to enter church. Met Haniellum. So I had to call Yoni to get the paper from him. [¶] 'Got home around 8:00 p.m. and the only paper he gave him was some four months of paper work and none of the bank papers. Called him back and didn't pick up his phone. After awhile called me back and I asked him to give me all the paper that was in the box or give me the box if he doesn't need anything from it so that I might be able to find some papers that would help me for the tax preparation. He tells me that the only other paper in there is Abraham's telephone book and he would like to keep it. And I know that is not the only thing in there!!!' Multiple exclamation points. [¶] 'I mean it is not his paper!!!' Multiple exclamation points in all capitals. 'He has no right to it. He is purposely not giving me the papers and there is no way for me to get any copies of the paper because that is the bank returned the original check. It is not fair what the whole family is doing to me. I never did anything to them!!!' Multiple exclamation points. [¶] . . . . 'I got really mad and I called Yehfer on the way home still really pissed, but Yehfer told me the worse thing that could happen from this is paying more money and we will be able to do it together even if it takes time. I'm a little calm now. I'll read my Bible and sleep. I have my son, my lovely charming son scratching his hands from the allergies he has. He likes it when I scratch it for him.' "

the jury that Asmerom lied when he testified there were no problems between the two families and that Winta did not love Abraham.

## 2. Analysis

Asmerom contends the entries were hearsay and were not made admissible by the state of mind hearsay exception (Evid. Code, § 1250). He all but concedes, however, that the first entry regarding Winta's feelings about Abraham were admissible to prove her state of mind, and we agree. "Subject to Section 1252,[9] evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action. . . ." (Evid. Code, § 1250, subd. (a)(1), footnote added.) It was thus within the court's discretion to admit this first entry. (See *People v. Escobar* (2000) 82 Cal.App.4th 1085, 1103; *People v. Ortiz* (1995) 38 Cal.App.4th 377, 386 [the trial court is vested with broad discretion in determining admissibility of evidence pursuant to the state of mind exception to the hearsay rule].)

The second entry, about Winta's subsequent difficulties with the Gebreselassie family, does not fall so neatly within the state of mind exception. Evidence Code section 1250, subdivision (b) specifies that this exception "does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed." As the second entry consisted of "historical memories and beliefs" about Winta's problems with the Gebreselassies, it thus was not admissible to prove the truth of those memories and beliefs. (See *People v. Deeney* (1983) 145 Cal.App.3d 647, 652 [descriptions of conduct of a third person that may have caused the declarant's state of mind are inadmissible under section 1250].)

---

[9] Under Evidence Code section 1252, a statement of the declarant's mental condition is admissible unless the statement was made "under circumstances such as to indicate lack of trustworthiness."

28

Nonetheless, it was admissible for another reason. The fact that Winta felt the Gebreselassies were treating her unfairly had some tendency to prove that she and her family would not have welcomed Asmerom's company or invited him to Regbe's apartment, and thereby to undermine his contrary testimony. Used thus as circumstantial evidence of Winta's state of mind, the statement was nonhearsay circumstantial evidence not made inadmissible by the hearsay rule. (See generally *People v. Ortiz, supra*, 38 Cal.App.4th at pp. 377, 389–392.) Asmerom complains that no limiting instruction was given as required when out of court statements are used as circumstantial evidence of the declarant's mental state, but he did not request such an instruction and has therefore forfeited the claim for appeal. Finally, and in any event, these diary entries were of little independent significance in light of the substantial testimony confirming the strains between Asmerom and the Meharis in the months leading up to the murders. Assuming arguendo it was error to admit the entry concerning Winta's treatment by the Gebreselassies, the error could not conceivably have been prejudicial.

### III. Exclusion of Evidence of Victims' Alleged Homosexuality

Asmerom contends the trial court committed reversible error when it excluded certain evidence concerning Angesom and Merhawi's sexual orientation. Not so.

### Background

### 1. The Ruling

Asmerom argued that the Mehari siblings killed Abraham in the belief that only he knew of their sexual orientation, and that they tried to kill Asmerom for the same reason. The prosecution moved to exclude evidence of Merhawi and Angesom's alleged homosexuality unless Asmerom placed it in issue in his defense case. Until that time, the prosecution asked the court to preclude defense questions about the twins' sexual orientation and alleged involvement with gay chat lines or web sites and to exclude related telephone and email records and testimony about the Eritrean Orthodox Church's

29

disapproval of homosexuality.[10]  Asmerom countered that evidence the twins were in fact homosexual "will put to rest any claim that they were not gay and therefore did not really care that defendant would be making these revelations."

The court ruled the twins' sexual orientation was not to be mentioned until after Asmerom had testified to his belief in that regard.  "The relevant part is not whether they're homosexuals or not.  It's  [Asmerom's] belief that they are."  The court explained that Asmerom would be allowed to introduce evidence supporting that belief in his case in chief, "and we'll see how far you get with that if you want."[11]

Asmerom sought in his case-in-chief to recall Merhawi to testify about his "homosexuality issues" and alleged confession during their November 10, 2006 encounter at the library, and to recall Angesom "for questions about the homosexuality that we were unable to address in the prosecutor's case in chief."  The prosecutor reiterated her position that the twins' actual sexual orientation was irrelevant.  Moreover, she observed that Asmerom had already questioned Angesom and Merhawi about their sexual orientation on cross-examination, merely shifting to the term "lifestyle" when the court barred his questions about homosexuality.  The court permitted Asmerom to recall only Merhawi, and only for questioning about the encounter at the library.  It later sustained objections when Asmerom asked Merhawi whether he was "fooling and deceiving the church" about his homosexuality, whether anyone in his church or community knew he was homosexual before November 10, 2006, and whether the twins were engaging in homosexual activities when they arrived in this country.

### 2. The Evidence

In his opening statement, Asmerom presented his view that the Meharis murdered Abraham, and later attempted to murder him, to prevent the Gebreselassies from disclosing Merhawi's homosexuality.  The defense continued on that theme during the

---

[10] The prosecutor acknowledged that evidence of Asmerom's threats to go public with the twins' alleged homosexuality was relevant and admissible.

[11] Later, during the prosecution case, the court reaffirmed that ruling in the face of renewed defense attempts to question the twins about their actual sexual orientation.

state's case-in-chief, and Merhawi was extensively cross-examined about the confrontation at the library, Asmerom's threats to expose his "lifestyle," the Eritrean Orthodox Church's views on homosexuality, Winta's and Yehferom's reactions to Asmerom's disclosure, whether the Meharis decided to kill Asmerom to "make sure [he] would not be able to expose your lifestyle and further investigate you and your family having murdered Abraham," and whether they killed Abraham for that same reason. Asmerom also cross-examined Angesom about whether he was angry because Asmerom "was wanting to meet with your family about your social relationships and Merhawi's relationship with Issac, correct?"

In his defense case, Asmerom testified about Merhawi's sexual orientation and their church's disapprobation of homosexuality. He testified that "[t]he topic of homosexuality in our culture is something people kill for. It's not something to be taken lightly and just blame the people about that." Asmerom also testified about the investigation he had conducted after Abraham told him his suspicions about Merhawi. Asmerom testified he had proven through phone records that Merhawi was contacting an interactive gay website; and then, using a false identity, Asmerom exchanged emails with Merhawi to confirm he was homosexual. When Asmerom and Tesfu confronted Merhawi with this "evidence" at the library on November 10, according to Asmerom, Merhawi admitted he was gay and that he had molested Issac. Asmerom threatened to expose Merhawi unless he confessed to his family.

Asmerom also described how he had visited Yehferom that day to discuss Merhawi's homosexuality. He testified that he told Yehferom "Since you're an active member of the Ethiopian orthodox church, and since this homosexual behavior brings disgrace to your family, it's unacceptable and disgusting." He elaborated on cross-examination that "[i]n our culture homosexuality could drive to kill each other. That's something that could have you get killed. It's a pride, a family pride. If I am a homosexual person, my mother would not be approached by anybody. My family would be shot. They would be considered like garbage. The first thing the family would do, they would stay away from me, or I would have to kill myself, or my mother or my

family members would have to commit suicide." Asmerom elicited similar testimony from church administrative leader Tekle Germle that "within the orthodox church, within our religion, homosexuality is not allowed or acceptable. . . ." and that Germle personally believed homosexuals should be banned from the church.

Asmerom also testified that on November 4, 2006, he went to the Mehari family with his "proof" of Merhawi's sexual orientation  He told them "that Merhawi had a problem, that he is a homosexual, and they were shocked.  You know why they were shocked?  Because he is part of our family.  He's our brother.  It's unacceptable behavior because that's how it is.  They were all shocked.  And because he also serves at the church, we were shocked. . . .  Because they know homosexual behavior and because it's acceptable in this country, we decided we have to inform the church now."

When Merhawi was recalled in Asmerom's case in chief, Merhawi was asked "Isn't it true that you confessed to my client that Winta poisoned Abraham because he promised to you he wouldn't reveal your secret homosexual lifestyle to the community and church?"  Merhawi denied it.  He also denied that Asmerom promised not to reveal his homosexuality if he confessed the Meharis poisoned Abraham or that he molested Issac.

### 3.  Analysis

Asmerom's central complaint seems to be that, while the jury heard a good deal about homosexuality, his defense was crippled because he was not permitted to question the Mehari twins about or offer other evidence to prove "the fact of" their homosexuality. Nonsense.  As chronicled above, Asmerom was permitted to introduce more than ample evidence supporting his defense theory that the Meharis tried to kill him because he threatened to go public with his accusations about Angesom and Merhawi.  While the court limited his ability to introduce evidence of their actual sexual orientation or activities, its rulings were well within its broad discretion to exclude evidence on the grounds that its probative value was substantially outweighed by the risk of undue delay, prejudice or confusion.  (Evid. Code, § 352;  see *People v. Geier* (2007) 41 Cal.4th 555,

32

581, overruled on other grounds in *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 385.)

## IV.  Admission of Yehferom's Testimony About Issac's Custody

Asmerom contends the court committed prejudicial error when it admitted Yehferom's testimony that after Winta's death the family court awarded him custody of his orphaned nephew and denied the Gebreselassies' bid for visitation.  The People argued the testimony was relevant because it tended to undermine Asmerom's accusation that Yehferom participated in Abraham's murder.  There was no error.  While the family court's decision was at best marginally relevant to the issues at trial, the trial court reasonably found it had adequate bearing on Yehferom's credibility to warrant admission.  "A collateral matter has been defined as 'one that has no relevancy to prove or disprove any issue in the action.'  [Citation.]  A matter collateral to an issue in the action may nevertheless be relevant to the credibility of a witness who presents evidence on an issue."  (*People v. Rodriguez*  (1999) 20 Cal.4th 1, 9.)  In any event, the testimony was relatively innocuous.  Asmerom's contention that the jurors would infer from it that the family court had determined the Gebreselassies were "bad people" and Yehferom was "a good guy" and defer to that inference rather than make their own assessments is nothing but speculation.  Accordingly, assuming the court erred, there is no reasonable possibility the error affected the verdict.

## V. Prosecutorial Misconduct

Both defendants contend the prosecutor committed misconduct in closing argument when she appeared to comment on the absence of evidence the court had precluded the defense from presenting at trial.  There was no prejudicial error.

### A. Background

During cross-examination, Tewodros's counsel asked Merhawi about a May 2009 incident at a rest stop near Los Angeles, when Merhawi accidentally encountered defendants' sister Asmeret with a friend.  Counsel asked Merhawi: "Isn't it a fact that you told both of them words to the following effect, 'I'm going to kill you.  I'm going to kill you.'  And then to her, 'I'm going to kill you,' meaning her, 'and drink your blood?'"

Merhawi acknowledged the encounter occurred but denied making the threat. He elaborated that Asmeret was insulting and that one of her companions said he would "brew you like coffee beans."

At the start of Asmerom's defense case he proffered testimony from Degefu Bagaro that Bagaro was at the encounter and observed Merhawi's threat. The defense argued the testimony was relevant both to impeach Merhawi and to support Asmerom's asserted need to defend himself against the Meharis. The court found the testimony was of only marginal relevancy and excluded it under Evidence Code section 352.

In her rebuttal argument, the prosecutor repeatedly touched on the theme that the defense had tried to smear the Meharis to distract the jurors from the evidence. As one example, she argued: "The questions about Merhawi allegedly threatening to kill Asmeret and drink her blood while they're at a rest stop on Interstate 5 where there are other witnesses, he told you he never said that, and that is the state of the evidence because Asmeret didn't get up and testify about that, did she? No witnesses got up and testified about that. That's about distracting you from the evidence in this case because the state of the evidence is that never happened."

After closing arguments finished and the jury was excused for the day, Asmerom asserted the prosecutor committed misconduct in "suggest[ing] to the jury that we didn't produce a witness that we weren't able to do because of the court's ruling." Asmerom requested an admonition "letting [the jurors] know that production of all evidence is not required, and that the prosecutor mentioned that there [was] certain evidence by the defense that was not required that should not be taken into consideration because not all evidence is required. Or preferably, if the court would consider that the prosecutor made a mistake." In response, the prosecutor asserted that her comment merely referred to the defense's failure to call Asmeret to testify about the alleged threats. The court denied the request for an admonition.

**B. Analysis**

" 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal

Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " (*People v. Ochoa* (1998) 19 Cal.4th 353, 427.) " 'The focus of the inquiry is on the effect of the prosecutor's action on the defendant, not on the intent or bad faith of the prosecutor.' " (*People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1528.)

Preliminarily, we reject the People's contention that defendants failed to preserve this claim for appeal by waiting too long to object and request an admonition. " 'To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct.' " (*People v. Bradford* (1997) 15 Cal. 4th 1229, 1333.) Asmerom's counsel refrained from interrupting the prosecutor's argument, but he objected and requested an admonition promptly after her argument and in time for the court to have included an admonition in its jury instructions. We see no reason to suspect that, as the People assert, the timing of such an admonition would have confused or distracted the jury.[12] (See *People v. Lewis* (2009) 46 Cal.4th 1255, 1303, fn. 34 [objection and request for rereading of jury instruction not forfeited by waiting until end of prosecutor's argument].)

Defendants fare less well in asserting prejudicial misconduct. The prosecutor's reference to their failure to call Asmeret to testify about Merhawi's alleged threat was a permissible comment on the state of the evidence. (See *People v. Vargas* (1973) 9 Cal.3d

---

[12] The cases the People cite to argue the admonition was untimely merely observe that defense counsel sometimes refrain from objecting to a prosecutor's comments to avoid drawing the jurors' attention to them. (See *People v. Harris* (2008) 43 Cal.4th 1269,1290 [failure to request an admonition not ineffective assistance of counsel where counsel could have decided objection would highlight prosecutor's remarks]; *People v. Huggins* (2006) 38 Cal.4th 175, 206 [same].) That point has no bearing on whether the objection and request for an admonition here was timely.

470, 475 [comment on defense failure to call logical witnesses not misconduct].) But assuming arguendo that the prosecutor's remark was deceptive,[13] defendants exaggerate its potential effect. "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970, overruled on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421 fn. 22; *People v. Berryman* (1993) 6 Cal.4th 1048, 1072, overruled on another point in *People v. Hill, supra*, 17 Cal.4th at p. 823, fn.1.)

Here, the prosecutor's brief and isolated remark at worst merely drew attention to the lack of evidentiary support for one of many defense attacks on Merhawi's character and credibility. It concerned a tangential event that occurred more than two years after the murders, and the longstanding and intense ill-will between the Mehari and Gebreselassie families was exhaustively demonstrated at trial regardless of what did or did not happen at the rest stop. Furthermore, the court instructed the jurors that neither side was required to call all available witnesses, and that statements of counsel are not evidence. We presume the jury understood and followed those instructions. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 173.) On this record, it is not reasonably possible that a different result would have obtained absent the challenged comment. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 1019; *People v. Sanchez* (1995) 12 Cal.4th 1, disapproved on another point in *People v. Doolin, supra*, 45 Cal.4th at p. 421, fn. 22.)

---

[13] We do not mean to suggest that any deception was intentional. As the Supreme Court has observed, "the term prosecutorial 'misconduct' is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error." (*People v. Hill* (1998) 17 Cal.4th 800, 842.)

## VI. Post-Verdict Request For Trial Transcript

### 1. Background

After the verdicts were returned, Asmerom retained new private counsel to move for a new trial and requested a copy of the trial transcript, which the court denied. Asmerom renewed the request when he moved for a new trial on grounds including ineffective assistance of counsel, the exclusion of evidence of the twins' homosexuality and Abraham's murder, and the denial of adequate opportunity to consult with counsel before testifying.[14] His new attorney acknowledged he did "not know whether the trial transcript would reflect any of the information asserted by the defendant," but argued a transcript was necessary to properly raise the issues in a new trial motion.

The trial court found the defense had not shown a particularized need for the transcript and denied the request. Noting that it had presided over the trial, the court further ruled that Asmerom's claims of jury misconduct, inadequate consultation with counsel before testifying and improper exclusion of evidence were meritless.

### 2. Analysis

Asmerom contends the denial of his request for a trial transcript violated his due process rights and requires remand to allow him to seek a new trial based on the reporter's transcript prepared for this appeal. He is wrong. The trial court may properly deny a request for free transcripts to prepare a new trial motion where an indigent defendant fails to show a particularized need for them, and it is the defendant's burden to establish that necessity. (*People v. Bizieff* (1991) 226 Cal.App.3d 1689,1702; *People v. Lopez* (1969) 1 Cal.App.3d 78, 83.) "There are no mechanical tests for deciding when the denial of transcripts for a motion for new trial is so arbitrary as to violate due process

---

[14] Asmerom's new counsel explained at the hearing that "actually, he's alleging misconduct from most of the main principals in the case, other than the court reporter and the clerk, and it's impossible for me to properly raise these issues without having a transcript. All I know about the trial is what he's told me and a few things that Mr. Stallworth has told me about the trial." Asmerom also wanted an evidentiary hearing at which he would call Sergeant Morris, Inspector Beal and several of the jurors as witnesses.

or to constitute a denial of effective representation. Each case must be considered on its own peculiar facts and circumstances." (*People v. Bizieff*, *supra*, 226 Cal.App.3d at p. 1700; *People v. Markley* (2006) 138 Cal.App.4th 230, 242).

Here, the judge who heard the new trial motion had presided over the trial and was intimately acquainted with the issues raised. Both defendants' trial attorneys were deeply knowledgeable about the case, and there was no showing that either was unable or unwilling to consult with Asmerom's newly retained counsel. (Cf. *People v. Lopez, supra*, 1 Cal.App.3d at p. 82 [new trial motion ordinarily does not require a full trial transcript because it is usually brought by the lawyer who tried the case before the judge who presided at trial]; see also *United States v. Banks* (M.D. Pa. 1974) 369 F.Supp. 951, 955, fn. 7 [need for transcript obviated by trial judge's familiarity with the case].) The trial court could also legitimately consider the delay involved in preparing a voluminous (in the neighborhood of 30 volumes, as it turned out) transcript. (*People v. Bizieff, supra*, 226 Cal.App.3d at p. 1704.) Moreover, even with the benefit of the full trial transcript prepared for this appeal, Asmerom has not shown with any specificity how the transcript would have enabled his new counsel to effectively seek a new trial. The court reasonably denied his request.

## TEWODROS'S APPEAL

### I. Sergeant Morris's Testimony

### A. Lay Opinion Testimony On Credibility

Tewodros asserts the court erred when it admitted Sergeant Morris's testimony that he did not believe the statement Tewodros gave to police after the murders.[15]

### 1. Background

Questioned at the police station after the shootings, Tewodros repeatedly told Sergeant Morris he did not know Asmerom would be at the Meharis' apartment that day, did not summon Asmerom or open the apartment door for him, and that he left with Issac

---

[15] Asmerom joins this claim.

after, not before, Asmerom fired the first shot. His testimony at trial was consistent with his statement to police.

In rebuttal, the prosecutor called Sergeant Morris. Over objection Sergeant Morris testified that, with respect to Tewodros's police statement, he "did not believe [T]ewodros's account of events. So I, again, was asking him what occurred at 5301 Telegraph. And during the course of the investigation, his answers were not adding up. " After the court overruled a defense objection and motion to strike, Sergeant Morris repeated that Tewodros's "answers were not adding up to what occurred that day. I just didn't believe what he was telling me." Later, on cross-examination by Asmerom, Sergeant Morris repeated that he "didn't believe what [Tewodros] was telling me that day." The court again overruled the objection and motion to strike.

## 2. Analysis

It is settled that a lay witness's opinion about the truthfulness of another witness's statements is irrelevant and inadmissible. "Lay opinion about the veracity of particular statements by another is inadmissible on that issue. As the Court of Appeal recently explained . . . , the reasons are several. With limited exceptions, the fact finder, not the witnesses, must draw the ultimate inferences from the evidence. Qualified experts may express opinions on issues beyond common understanding [citations], but lay views on veracity do not meet the standards for admission of expert testimony. A lay witness is occasionally permitted to express an ultimate opinion based on his perception, but only where 'helpful to a clear understanding of his testimony' [citation], i.e., where the concrete observations on which the opinion is based cannot otherwise be conveyed. [Citations.] Finally, a lay opinion about the veracity of particular statements does not constitute properly founded character or reputation evidence [citation], nor does it bear on any of the other matters listed by statute as most commonly affecting credibility [citation]. Thus, such an opinion has no 'tendency in reason' to disprove the veracity of the statements." (*People v. Melton* (1988) 44 Cal. 3d 713, 744 (*Melton*); see also *People v. Sergill* (1982) 138 Cal.App.3d 34, 39–40 [where credibility was critical, admission of police officer's opinion of child victim's truthfulness was prejudicial error]; but see

*People v. Padilla* (1995) 11 Cal.4th 891, 946–947 [declining to decide whether this aspect of *Melton* survived Proposition 8].)

Here, Sergeant Morris's testimony that he disbelieved Tewodros's statements and that his version of the shootings didn't "add[] up" cannot rationally be distinguished from the statements held inadmissible in *Melton* and *Sergill*. The People nonetheless argue it was admissible to explain why Morris questioned Tewodros for so long and mostly with the tape recorder off, not for his opinion on veracity, but we disagree. Despite Tewodros's objection that the testimony was "opinion and conclusion," the prosecutor never suggested it was relevant for the different purpose the People now propose; nor was the jury given a limiting instruction to that effect. The record, accordingly, gives no basis to believe the jury would have considered Sergeant Morris's testimony for anything but its plain meaning—i.e., that Tewodros lied to the police and, by clear inference, also lied to the jury. It should not have been admitted.

## B. Hearsay About Tewodros's Gun

Tewodros and Asmerom contend the trial court committed further error when it allowed Sergeant Morris to testify that there was no record Tewodros registered the gun he bought before the murders. Tewodros also contends that, once that testimony came in, the court erred when it refused to let him reopen his case to rebut it. Here, too, their contentions have merit.

Tewodros testified in his case in chief that he purchased a gun several months before the shooting because he was concerned about protecting himself and his family from the unknown person he thought was responsible for Abraham's death. After his arrest he told police about the gun and told them where to find it in his mother's closet. There was nothing to suggest the gun was used in the murders.

On cross-examination, the prosecutor asked Tewodros whether he had registered the gun in his name. He testified that he had and explained that when he purchased the gun he filled out the registration paperwork, took an exam on gun safety, and waited the 30-day period to receive the firearm. On rebuttal, the prosecutor presented testimony from Sergeant Morris that two service dispatchers ran inquiries and told him no guns

were registered to Tewodros.  Tewodros objected and moved to strike the testimony as hearsay, but the objection was overruled.  The prosecution rested its case that afternoon.

The next morning Tewodros moved to reopen his case to show he had done all he could to register the gun in his name.  He proffered new gun registration paperwork in his name, a receipt for a $30 payment for gun registration made out to the store where he bought it, and a handgun safety certificate from the California Department of Justice.  He also offered to testify that he had paid for the registration and believed the gun shop would handle the paperwork.  Defense counsel argued the evidence was necessary to rebut an anticipated prosecution argument that Tewodros's ownership of an unregistered gun indicated a secretive or even illegal intent.   The prosecutor responded that she would not make that argument and objected that the proffered records were unauthenticated and should have been offered during Tewodros's testimony.  The court found the issue was only marginally relevant and denied the request to reopen.

### C. The Errors Were Prejudicial

The state, correctly, does not dispute that Morris's testimony about the firearm registration was inadmissible double hearsay.  (See, e.g., *People v. Wimberly* (1992) 5 Cal.App.4th 439, 445–446; *People v. Scalzi* (1981) 126 Cal.App.3d 901, 906.)  Whether or not the court's subsequent refusal to allow Tewodros to reopen his case was an abuse of discretion (see *People v. Funes* (1994) 23 Cal.App.4th 1506, 1520), it prevented Tewodros from refuting the plain implication that he lied to the jury when he testified he had registered the gun purchased just months before the murders.  We consider, then, whether the cumulative impact of this error and the erroneous admission of Morris's testimony that he disbelieved Tewodros's statement to police requires reversal.  We are persuaded that it does.

"Lengthy criminal trials are rarely perfect, and this court will not reverse a judgment absent a clear showing of a miscarriage of justice.  [Citations.]  Nevertheless, a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.  (*People v. Purvis, supra*, 60 Cal.2d at pp. 348, 353[combination of "relatively unimportant misstatement[s] of fact or

41

law," when considered on the "total record" and in "connection with the other errors," required reversal]; *People v. Herring, supra*, 20 Cal.App.4th at pp. 1075–1077 [cumulative prejudicial effect of prosecutor's improper statements in closing argument required reversal]; see *In re Jones* (1996) 13 Cal.4th 552, 583, 587 [cumulative prejudice from defense counsel's errors requires reversal on habeas corpus]; *People v. Ledesma* (1987) 43 Cal.3d 171, 214–227 [same]. . . .)" (*People v. Hill, supra*, 17 Cal.4th at pp. 844–845, parallel citations omitted.)

Tewodros's credibility went to the heart of his defense case. No physical evidence connected him to the shooting, nor were there any confessions or admissions. The phone records showing calls made from Tewodros's cell phone to his brother Dawit's were open to innocent as well as culpable interpretations. Indeed, whether Tewodros was a knowing participant in the murders depended almost completely on his word against that of the three Mehari brothers, whose own depictions of the critical events displayed troubling inconsistencies. The jurors were properly instructed that they could reject the entire testimony of a witness who testified falsely as to any material point, and the prosecutor's closing argument hammered on the theme that the case came down to witness credibility.

In this context, where Tewodros's veracity weighed so crucially in the balance, the jury was allowed to hear testimony from a highly experienced police investigator with intimate knowledge of the case that he believed Tewodros lied when he spoke to the police and denied involvement in his brother's crimes. Compounding that damaging testimony, at the very end of trial the jury heard from the same officer that, in essence, Tewodros's testimony that he had registered the gun he bought not long before the murders was untrue.

A cold written record of a trial is often an inadequate substitute for being present in the courtroom and observing the proceedings first-hand. Here, when the trial court ruled upon the motion for new trial, it observed that Tewodros did not appear to be a credible witness. Maybe so. But on this record we cannot deny the reasonable possibility that these errors, in the aggregate, tipped the scales in the jury's assessment of

Tewodros's credibility and thus denied him the fair trial he was entitled to. As Tewodros' counsel expressed at oral argument, all that is necessary for reversal is for there to be a reasonable possibility that without the errors a single juror would have voted to acquit. Reversal is required under any standard. (See *People v. Hill, supra,* 17 Cal.4th at p. 844; *People v. Maestas* (1993) 20 Cal.App.4th 1482, 1498.)[16]

**DISPOSITION**

The judgment as to Asmerom is affirmed. The judgment as to Tewodros is reversed. The matter is remanded to the trial court for further proceedings.

---

[16] In light of this conclusion, we do not address Tewodros's contention that the court erred when it denied his motions to sever and for mistrial based on Asmerom's misconduct in court. Nor do we reach his claim of sentencing error.

_____
Siggins, J.

We concur:

_____
Pollak, Acting P.J.

_____
Jenkins, J.

*People v. Gebreselassie*, A133350, A134246

44